UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HENDERSON FORD                          CIVIL ACTION

VERSUS                                  NUMBER: 13-0109

MARLIN GUSMAN, ET AL.                   SECTION: "I"(5)

## REPORT AND RECOMMENDATION

Presently before the Court is the Rule 56(c) motion for summary judgment of defendants, Sheriff Marlin N. Gusman and Dr. Samuel Gore, and plaintiff's response thereto.  (Rec. docs. 19, 23).  For the reasons that follow, it is recommended that the defendants' motion be granted and that plaintiff's suit be dismissed.

On January 28, 2013, pro se plaintiff, Henderson Ford, filed the above-captioned 42 U.S.C. §1983 proceeding, with pendent state law claims, in forma pauperis against defendants, Sheriff Marlin N. Gusman, Dr. Samuel Gore, and other unnamed employees of the Orleans Parish Prison ("OPP").  (Rec. doc. 3).  In his complaint, Ford set forth a litany of claims regarding the conditions of confinement at OPP where he was incarcerated from August 1, 2012 until October 30,

2012.  Because he was not incarcerated at the time that suit was filed, Henderson escaped the effect of 28 U.S.C. §1915(g) and was permitted to proceed in forma pauperis despite his lengthy history of frivolous litigation going back to the early to mid 1980's.  As will be discussed more fully infra, among the frivolous lawsuits that he has filed here in the past are two in which he urged some of the very claims that he presents herein except for a different three-month period in which he was incarcerated at OPP at the end of 2011.  See Ford v. Gusman, Nos. 11-CV-2950 c/w 12-CV-0422, 2012 WL 2567063 (E.D. La. May 11, 2012), adopted, 2012 WL 2567034 (E.D. La. July 2, 2012).[1]/  On February 26, 2013, Ford amended his complaint to add two additional yet unnamed employees of the Sheriff as defendants.  (Rec. doc. 7).  The two specifically named defendants, the Sheriff and Dr. Gore, now move for summary judgment pursuant to Rule 56(c).  Before proceeding to the multitude of claims enunciated by Ford, the Court will recall the summary judgment standards of Rule 56(c) as well as some additional legal principles applicable to most, if not all, of Ford's claims.

Summary judgment is appropriate under Rule 569(c) when no

---

[1]/ The Court cannot help but notice that in answer to Question No. I of the standardized §1983 complaint that he utilized in this case, plaintiff failed to identify these previous lawsuits although they admittedly pertained to a different time period.  (Rec. doc. 3, pp. 1-2).

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548 (1986). Although all inferences drawn from the evidence are to be resolved in the non-movant's favor, he may not rest on the mere allegations or denials in his pleadings. <u>Spellman v. Shalala</u>, 1 F.3d 357, 360 (5th Cir. 1993). Rather, once a properly supported motion for summary judgment is made, the burden shifts to the non-movant who bears the burden of proof at trial to show with "'significant probative' evidence that there exists a triable factual issue." <u>Kansa Reinsurance v. Cong. Mortgage Corp. of Texas</u>, 20 F.3d 1362, 1371 (5th Cir. 1994)(quoting <u>In re: Municipal Bond Reporting Antitrust Litig.</u>, 672 F.2d 426, 440 (5th Cir. 1982)). That burden is not satisfied by "... 'some metaphysical doubt as to the material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' ... or by only a 'scintilla' of evidence." <u>Little of Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994)(<u>en banc</u>)(citations omitted). Rather, the nonmovant "... must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case; naked assertions of an actual dispute will not suffice." <u>Matter of Lewisville Properties, Inc.</u>, 849 F.2d 946, 950 (5th Cir. 1998). The insufficiency of the proof must be such that it would prevent a rational finder of fact from finding for the

3

non-moving party.  <u>Phillips Oil Co. v. OKC Corp.</u>, 812 F.2d 265, 272-73 (5th Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 851, 108 S.Ct. 152 (1987).

With some exceptions, most of plaintiff's claims in this case are initially framed as alleging the deprivation of not only his constitutional rights, but those of other inmates.  However, this case has not been certified as a class action[2]/ and plaintiff lacks standing to assert the rights of others.  <u>Patin v. LeBlanc</u>, No. 11-CV-3071, 2012 WL 3109402 at *7-8 (E.D. La. May 18, 2012), <u>adopted</u>, 2012 WL 3109398 (E.D. La. July 31, 2012).  Although plaintiff's original complaint concludes with a list of thirteen other inmates who provided "affidavits" in support of his allegations,[3]/ those inmates have neither signed the complaint nor submitted separate applications to proceed <u>in</u> <u>forma</u> <u>pauperis</u>, thus leaving but one plaintiff in this lawsuit, namely, Ford himself.

In addition, with just a few notable exceptions, many of plaintiff's claims are extremely vague and are lacking in the specifics that are needed to establish liability against the two named defendants in the capacities in which they have been sued. "'Plaintiffs suing government officials in their individual capacities ... must allege specific conduct giving rise to a

---

[2]/ <u>See</u> rec. doc. 12.

[3]/ Rec. doc. 3, p. 29.

constitutional violation.   This standard requires more than conclusional assertions:  The plaintiff must allege specific facts giving rise to the constitutional claims.'"  Carter v. Strain, No. 09-CV-0015, 2009 WL 3231826 at *1 (E.D. La. Oct. 1, 2009)(quoting Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002)).   This is so because "'[p]ersonal involvement is an essential element of a civil rights cause of action.'"  Id. (quoting Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983).   Supervisory officials like the Sheriff "... cannot be held liable for federal civil rights violations allegedly committed by his associates based merely on a theory of strict liability or vicarious liability." Id. (footnotes omitted).

Moreover, "'[i]n a suit brought against a municipal official in his official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury.'"  Carter, 2009 WL 3231826 at *2 (quoting Parm v. Shumate, 513 F.3d 135, 142 (5th Cir. 2007), cert. denied, 555 U.S. 813, 129 S.Ct. 42 (2008).  "'A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity.'"  Id. (quoting Colle v. Brazos County, Texas, 981 F.2d 237, 245 (5th Cir. 1993)).   Rather, the plaintiff "... must identify the policy or custom which allegedly caused the deprivation of his constitutional rights." Id. (citing Murray v. Town of Mansura, 76 Fed.Appx. 547,

5

549 (5th Cir. 2003) and <u>Treece v. Louisiana</u>, 74 Fed.Appx. 315, 316 (5th Cir. 2003)).

As noted above, plaintiff was housed at OPP for a limited period of time from August 1, 2012 to October 30, 2012. He pled guilty to criminal charges on August 14, 2013. (Rec. doc. 23, p. 26). For both the time that he was a pre-trial detainee and the time that he was a convicted prisoner, in an episodic act or omission case like this one plaintiff can prevail only if he demonstrates that the defendants acted with deliberate indifference to a substantial risk of serious harm which resulted in injury. <u>McCarty v. Zapata County</u>, 243 Fed.Appx. 792, 794 (5th Cir. 2007); <u>Hare v. City of Corinth</u>, 74 F.3d 633, 647-48 (5th Cir. 1996). To prove deliberate indifference, plaintiff must show that prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn, that the officials actually drew that inference, and that the officials' response indicated that they subjectively intended that harm occur. <u>Thompson v. Upshur County, Texas</u>, 245 F.3d 447, 458-59 (5th Cir. 2001). The failure to alleviate a significant risk that the official should have perceived but did not is insufficient to show deliberate indifference. <u>Domino v. Texas Dept. of Criminal Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001). "[D]eliberate indifference cannot be inferred merely from a negligent or even

grossly negligent response to a substantial risk of serious harm." Thompson, 245 F.3d at 459.  The concept of deliberate indifference encompasses only the unnecessary and wanton infliction of pain that is repugnant to the conscience of mankind.  McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997).

Moreover, the alleged deprivation must be "sufficiently serious", meaning that "the inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977 (1994).  To amount to a constitutional violation, the conditions must be "'so serious as to deprive [the plaintiff] of the minimal measure of life's necessities ...'" Alexander v. Tippah County, Miss., 351 F.3d 626, 630 (5th Cir. 2003), cert. denied, 541 U.S. 1012, 124 S.Ct. 2071 (2004)(quoting Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)).  In order to prevail, the plaintiff must demonstrate that he suffered some harm that was more than de minimis.  Alexander, 351 F.3d at 631.

Finally, at least some of the substantive relief requested by Ford is not appropriate here.  Given the fact that plaintiff is not incarcerated and was not incarcerated at the time that suit was filed, he has not demonstrated a substantial threat of irreparable injury if a temporary restraining order and/or preliminary injunction are not issued.  McKay v. Terrebonne Parish Sheriff's

7

Office, No. 06-5770, 2007 WL 163059 at *8 (E.D. La. Jan. 17, 2007)(quoting DSC Communications Corp. v. OGI Technologies, Inc., 81 F.3d 597, 600 (5th Cir. 1996)).

Plaintiff's first, sixth, seventh, eighth, eleventh, twelveth, and thirteenth claims all implicate his right to medical care during the time that he was housed at OPP and thus will be addressed together.  In his first claim, plaintiff states that following his admission to OPP, he was medically screened whereupon he advised the attending murse that he suffered from HIV, diabetes, hypertension, and hepatitis C.  He also reportedly advised the nurse that he took pain medication for his legs and was missing a toe.  Given his various medical conditions, plaintiff was assigned to the so-called Medical Tier, Tier D-2, for housing.  From August 2nd to August 6th, plaintiff states that he made complaints and sick call requests about not receiving his medications.  Some time between August 6th and August 8th, a doctor appeared on Tier D-2 and questioned plaintiff about his illnesses.  Plaintiff again complained about the lack of medication which he was promised was coming soon.  All of this reportedly occurred in front of other inmates.

On August 10, 2012, plaintiff was sent to the Medical Department where he was seen by a nurse who handles infectious diseases.  Again, plaintiff asked about his medications.  Between

August 10th and August 13th, plaintiff filled out grievance forms about the lack of medication.  He appeared before the trial judge and pled guilty the following day and the judge directed the Sheriff's Office to allow him to go to sick call.  Plaintiff was presented with and signed a medical release form on August 15, 2012.   The following day, plaintiff made sick call and was questioned by a doctor in the presence of a female deputy.  During the course of this interview, plaintiff inquired about receiving a diabetic diet as well as his medication.  In response, the doctor increased the dosages of plaintiff's pain and diabetes medications. Plaintiff states that he received all of his medications for all of his illnesses on August 17, 2012.

By way claim number six, which is labeled "Tier D-2", plaintiff begins by characterizing said tier as a "death trap" which lacks a call system to alert deputies of emergency situations or a nurse on duty twenty-four hours per day.  Once a deputy arrives and informs the Medical Department of an emergency, it will sometimes take ten minutes or more before assisting personnel arrive.  Ford also alleges that sick inmates are transported to the Medical Department by other inmates because deputies do not wish to come into contact with prisoners who are ill.

In his seventh claim, plaintiff contends that "the defendant" does not have adequate medical equipment such as stretchers or a

call system whereby deputies can be promptly summoned for assistance.

Plaintiff's eighth claim, labeled "Food", centers on a lack of a proper diet for inmates who suffer from diabetes.  During the entirety of his three-month stay at OPP, plaintiff states that he received no diet meals or evening snacks although other inmates did receive the latter.  Instead, plaintiff indicates that he was served the same food as the general population which was high in fat and starch content.  He also contends that "the defendant" allows inmates who suffer from diabetes to purchase high sugar content snacks from the commissary simply to turn a profit.

In connection with his eighth claim, plaintiff relates an incident that occurred on September 12, 2012 when the Sheriff reportedly made a personal visit to the Medical Tier.  Upon being told of the lack of diabetic meals for plaintiff and other inmates who suffer from that condition, they were told to initiate a grievance within OPP's grievance procedure.  Plaintiff did so but received conflicting answers in response.  On October 19, 2012, plaintiff was told by a nurse that no special diet was offered at OPP.

Under his eleventh claim, denominated "Medical Department", plaintiff generally alleges that the procedures in place at OPP are inadequate and that the staff is overworked and undertrained,

10

resulting in inmates not receiving proper medical care.  He also contends that it takes four to six weeks to see a doctor.

In his twelveth claim, titled "Medication", plaintiff argues that the defendants' procedures for the distribution of medications are inadequate.  He states that inmates on the Medical Tier are given a two-week supply of medications all at one time which results in fights and drug abuse.  Personally, plaintiff indicates that although he is given his medication before breakfast, he waits until after breakfast to take it lest he feel poorly all day.  On a few occasions, inmates offered to sell him pain medication.  Also, a nurse has forgotten to dispense one or two of his medications on occasion.

Finally, by way of his thirteenth claim, plaintiff complains of a lack of privacy when discussing his medical condition with the doctor or the nurse.  Plaintiff states that such discussions were conducted in the presence of the arresting officer and a deputy at the time of his initial screening upon admission to OPP and that subsequent sick calls with the doctor or the nurse were conducted in the presence of a deputy.

Plaintiff was a pre-trial detainee at OPP for the thirteen days preceding his guilty plea and he was a convicted prisoner thereafter for the remainder of his incarceration.  A pre-trial detainee's complaint that jailers failed to provide him with

11

immediate medical treatment qualifies as an "episodic act or omission" which, in turn, triggers the deliberate indifference standard. <u>Tamez v. Manthey</u>, 589 F.3d 764, 769-70 (5th Cir. 2009). Accordingly, it is that standard against which the defendants' conduct be measured for the entirety of plaintiff's stay at OPP. <u>McCarty</u>, 243 Fed.Appx. at 794.

In order to establish a constitutional violation, Ford must demonstrate that the defendants were deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain. <u>Wilson v. Seiter</u>, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet. <u>Gobert v. Caldwell</u>, 463 F.3d 339, 346 (5th Cir. 2006)(internal quotation omitted). "To show subjective deliberate indifference, a plaintiff must present evidence: (1) that each defendant had subjective knowledge of 'facts from which an inference of substantial risk of serious harm could be drawn,' (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that ... [they] 'subjectively intended that harm occur.'" <u>Tamez</u>, 589 F.3d at 770 (quoting <u>Thompson</u>, 245 F.3d at 458-59). Such a showing requires a plaintiff to establish that prison "officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar

conduct that would clearly evince a wanton disregard for any serious medical needs.'" Domino, 239 F.3d at 756 (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985)).  Mere allegations of medical malpractice are insufficient to establish deliberate indifference to an inmate's serious medical needs.  Id.  And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also establish that he suffered substantial harm as a result of the delay.  Richard v. Martin, 390 Fed.Appx. 323, 325 (5th Cir. 2010)(citing Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993)); Taylor v. Bexar County, No. 10-CV-0045, 2011 WL 759549 at *4 (W.D. Tex. Feb. 23, 2011).

Based upon a review of the medical and other prison records that have been provided to the Court, plaintiff underwent a medical intake screening by a licensed practical nurse upon his admission to OPP on August 1, 2012.  (Rec. doc. 19-6, pp. 10-13).  Medical problems were identified by plaintiff as diabetes and hypertension for which he took unknown pressure pills and insulin.  (Id.).  His blood pressure was measured at 103/68.  (Id.).  After doing his own independent research, the nurse noted that plaintiff had been treated for HIV during his most recent stay at OPP from September 22, 2011 to December 27, 2011[4]/ and was on many HIV drugs during

_____

[4]/ As noted earlier, Ford litigated the adequacy of the medical care he received during this three-month stay at OPP in his

that time but was on no medications for diabetes or hypertension. (Id.).  Follow-up care was to be administered as needed.  (Id.). A list of medications was compiled and a "Special Needs Communication Form" was generated as a result of plaintiff's HIV status.  (Rec. doc. 19-6, pp. 2-3, 42).  An "HIV Chronic Care" form was also completed in which, inter alia, plaintiff was assigned to the Medical Tier, medication for his diabetes was ordered, and follow-up monitoring was scheduled.  (Rec. doc. 19-6, p. 21).

On August 7, 2012, six days after he was admitted to OPP, Ford initiated his first grievance.  (Rec. doc. 19-4, pp. 1-2).  In it, Ford requested legal assistance regarding some lawsuits he had filed rather than making any complaints about the adequacy of the medical care he was receiving.  (Id.).  The following day, plaintiff did submit a grievance in which he complained about not receiving medication for his diabetes and hypertension.  (Rec. doc. 19-4, p. 3).  On August 10, 2012, plaintiff underwent on Initial Exam Health Assessment in which his diabetes and hypertension were duly noted.  (Rec. doc. 19-6, pp. 4-9).  The records from that assessment indicate that a sick call visit was pending.  (Id. at p. 9).  On August 13, 2012, plaintiff completed a "Sick Call Request" form in which he complained that he had not received medication for

---

most recent lawsuits preceding this one.  Ford, 2012 WL 2567063 at *1.

his diabetes, leg pain, hypertension, and HIV. (Rec. doc. 19-6, p. 15).  Plaintiff was seen by a nurse that day who characterized the request as one for diabetes and HIV medications and placed plaintiff's name on the next doctor sick call visit. (Id.).

On August 15, 2012, plaintiff was evaluated by a physician who conducted a physical examination, ordered that he be started on various medications, and referred him to the HOP Clinic. (Rec. doc. 19-6, pp. 20, 36, 41, 43, 44).  As discussed earlier, plaintiff acknowledged receiving all of his medications on August 17, 2012.  (Rec. doc. 3, p. 10).  Plaintiff's first grievance regarding the lack of medication was formally responded to on August 21, 2012 wherein it was noted that he was receiving his medications as indicated but that his concerns would be further investigated and addressed accordingly. (Rec. doc. 19-4, p. 4). Plaintiff elected to proceed with that grievance through step two as he had not been compensated for his pain and suffering. (Id.). On August 20, 2012, the OPP Medical Department transmitted to the HOP Clinic via facsimile authorizations for the release of plaintiff's medical and pharmacy records. (Rec. doc. 19-6, pp. 35-37).

Notwithstanding the acknowledgment that he made in his complaint, on August 23, 2012, plaintiff initiated another grievance about not receiving his medications. (Rec. doc. 19-4, p.

15

12).  In due course, plaintiff was advised that he was receiving his medications as indicated but that the Director of Nursing would further review his concerns.  (Id. at p. 13).  On September 6, 2012, plaintiff completed another grievance form requesting diabetic meals and a snack.  (Rec. doc. 19-4, p. 22).  In response to that grievance, plaintiff was advised that his prescribed medication was unlikely to cause hypoglycemia and that an evening snack was therefore not required.  (Id. at p. 23).  Plaintiff was also instructed to complete a Sick Call Request form if he needed further medical care before his next scheduled follow-up appointment.  (Id.).  A second grievance was completed by plaintiff that same day in which he complained that he had not received all of his medications in the morning for the previous two days.  (Rec. doc. 19-4, p. 30).  Although plaintiff was receiving his medications as indicated, the Nursing Director was to address his concerns with the nursing staff.  (Id. at p. 31).  Another grievance was filed by plaintiff about this issue the following day and he was directed to fill out a Sick Call Request form to address his concerns more expeditiously.  (Rec. doc. 19-5, pp. 1-2).

Despite the advices he had received, on September 11, 2012, plaintiff initiated another grievance, this one designated an emergency, complaining that the nurses had forgotten to dispense his pain medication that day.  (Rec. doc. 19-4, p. 24).  By the

16

time that this grievance was responded to, plaintiff was told that he was receiving his medications as indicated and that the Director of Nursing Services would address his concerns with the nursing staff. (Id. at p. 32). Again, plaintiff was reminded to complete a Sick Call Request form to better address his concerns. (Id. at p. 33).

On September 24, 2012, plaintiff initiated two separate grievances about not receiving diabetic diet meals, referencing the conversation he had with the Sheriff twelve days earlier as alleged in his complaint. (Rec. doc. 19-5, pp. 5, 7). On October 3, 2012, plaintiff initiated a third grievance in which he renewed his complaint about the lack of diabetic meals. (Rec. doc. 19-5, p. 21). Non-receipt of antibacterial medication was the subject of another grievance on October 4, 2012. (Rec. doc. 19-5, p. 27).

On October 8, 2012, plaintiff completed another Sick Call Request form in which he related to experiencing pain that he thought might be the shingles. (Rec. doc. 19-6, p. 14). Plaintiff was seen by a nurse that day who referred him to the doctor on an urgent basis. (Id.). The following day, plaintiff was evaluated by a doctor who noted, inter alia, plaintiff's special housing and diabetic dietary needs, including orders for a can of Glucerna daily. (Rec. doc. 19-6, p. 18). Plaintiff was said to be monitoring his blood sugars with Accucheck in the evening and

medication orders included Metformin, Lisinopril, enteric coated aspirin, and Acyclovir for the shingles. (Id.). The doctor also completed a "Diabetic Chronic Care Treatment Plan" form in which it was reported that plaintiff was compliant with medication and diet although his glucose was poorly controlled. (Rec. doc. 19-6, p. 19). On October 11, 2012, the third of plaintiff's diet-related grievances was formally responded to and plaintiff was directed to ask the Medical Department to inform the OPP Dietician that he needed a special diet. (Rec. doc. 19-5, p. 22). However, the following day, plaintiff's second diet-related grievance was responded to and plaintiff was told that a specialty diet had been activated as a result of his doctor's visit on October 9, 2012. (Rec. doc. 19-5, p. 8).

On October 17, 2012, plaintiff initiated two more grievances about the lack of a diabetic diet. (Rec. doc. 19-5, pp. 38, 40). The second of those grievances was responded to by Major Beach that day who indicated that plaintiff did not have a medical diet and would have to consult with the Medical Department. (Rec. doc. 19-5, p. 41). On October 24, 2012, plaintiff was seen at the HOP Clinic for follow-up care of his HIV. His diabetes was described as asymptomatic and his blood pressure was 90/68. The assessment was HIV disease, Type II diabetes without complications, shingles, neuropathy, hepatitis C, and a history of cryptococcal meningitis.

18

Plaintiff was instructed to return to the HOP Clinic following his release from OPP.  (Rec. doc. 19-6, pp. 38-40).  The medical records also reflect that plaintiff was given a variety of prescription medications during his stay at the jail. (Rec. doc. 19-6, pp. 22-34).

"Deliberate indifference" is a stringent standard of fault, one which requires proof that a municipal actor disregarded a known or obvious consequence of his actions.  Ford, 2012 WL 2567063 at *8 (citing Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 1391 (1997)).  It has been equated with "subjective recklessness" as that term is used in criminal law.  Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997).

The medical and other prison records that are presently before the Court fall far short of establishing the objective and subjective components needed to prevail on a claim of deliberate indifference, particularly as respects the two specifically named defendants.  In fact, other than the mention of the Sheriff's reported visit to Tier D-2 on September 12, 2012, during which he advised plaintiff to file a grievance about the lack of a diabetic diet, no specific facts are alleged showing that either of the named defendants had any involvement in the provision of medical care to plaintiff.  Just like his most recent previous lawsuit

19

regarding conditions of confinement at OPP, the facts alleged by plaintiff are insufficient to establish that the defendants knew that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. Ford, 2012 WL 2567063 at *8.  Plaintiff does not allege, for example, that the Sheriff was even aware that he had filed a grievance about the lack of a special diet much less allege that he was aware of the outcome of that grievance.

Similarly, just as in his previous suit, "... it cannot be concluded that the conditions [plaintiff] described presented serious medical needs that posed a substantial risk of harm during his incarceration at the jail."  Ford, 2012 WL 2567063 at *8 (emphasis in original).  Ford has not established "... any serious risk of harm or any actual serious harm resulting from the alleged denial of treatment at OPP sufficient to rise to the level of serious medical needs for purposes of constitutional analysis." Id.  At most, Ford suffered a sixteen day delay in receiving his medications at the outset of his incarceration, a non-diabetic diet for three months, and a few random instances on which his medications were forgotten or dispensed at the wrong time.  There is no evidence, however, that those lapses were caused or were even known by the two defendants and plaintiff has not established that he suffered substantial harm as a result of any delay.  Richard,

390 Fed.Appx. at 325.   "Experiencing 'occasional delays in obtaining' medical treatment in insufficient to prove a refusal of providing medical care when the inmate's ... medical records demonstrate that he received treatment." <u>Taylor</u>, 2011 WL 759549 at *4 (quoting <u>Gobert</u>, 463 F.3d at 346); <u>Richard</u>, 390 Fed.Appx. at 324-25.  The Court also observes that a full-blown outbreak of the shingles was averted through the prompt administration of antiviral medications.  (Rec. doc. 19-6, p. 38).  And although plaintiff complains that the medical tier where he was housed did not have a call system, just as he did in his prior lawsuit, "... he has not alleged any serious risk of harm or actual harm resulting from that lack." <u>Ford</u>, 2012 WL 2567063 at *8.

With specific reference to the lack of a diabetic diet, summary judgment is appropriate here because Ford has presented no evidence of immediate danger to his health or that his health suffered in any measurable way due to the failure to provide a prescribed diet.  <u>Ford</u>, 2012 WL 2567063 at *10 (citing <u>Cody v. CBM Corr. Food Servs.</u>, 250 Fed.Appx. 763, 765 (8th Cir. 2007), <u>cert</u>. <u>denied</u>, 552 U.S. 1247, 128 S.Ct. 1482 (2008)).  This is particularly true in light of the fact that plaintiff's blood sugar levels were monitored and he was provided medication for his diabetes throughout the majority of his stay at OPP.  <u>Id</u>. (citing <u>Brightwell v. Lehman</u>, 637 F.3d 187, 194 (3rd Cir. 2011)).

Finally, the Court turns to plaintiff's medically-related, privacy-based claim.  Plaintiff complains that his initial medical screening was conducted in the presence of the arresting officer and a deputy and that subsequent sick call visits with the doctor or the nurse were conducted in the presence of a deputy.  He also complains under the rubric of his first claim that he was interviewed by a doctor in front of other inmates on the Medical Tier some time between August 6th and August 8th.

"A prisoner has no clearly recognized constitutional right in the privacy of his medical records, particularly not in the Fifth Circuit." Wells v. Pinion, No. 07-CV-6844, 2008 WL 2185329 at *6 (E.D. La. May 20, 2008).  See also Warren v. Epps, No. 10-CV-0022, 2011 WL 3349829 at *7 (S.D. Miss. Aug. 2, 2011); Perez v. Sheriff of Tangipahoa Parish, No. 10-CV-2073, 2011 WL 1226482 at *9-10 (E.D. La. Feb. 28, 2011), adopted, 2011 WL 1212940 (E.D. La. March 28, 2011); Barnes v. Brownlow, No. 08-CV-0194, 2008 WL 2704868 at *4 (E.D. Tex. July 7, 2008).  Nor does HIPPA create an express or implied cause of action for its violation.  Perez, 2011 WL 1226482 at *10; Barnes, 2008 WL 2704868 at *4 (citing Moore v. Mabus, 976 F.2d 268, 271 (5th Cir. 1992)).  The fact that correctional officers may have been present when plaintiff was seen by doctors or nurses is entirely understandable from a safety and security standpoint. Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987).  To

22

the extent that a doctor may have met with plaintiff in the presence of other inmates on the Medical Tier on one occasion, "[l]oss of ... privacy [is an] inherent incident[ ] of confinement in such a facility." Bell v. Wolfish, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873 (1979). In any event, as plaintiff does not allege that either of the named defendants was personally involved in that isolated incident, there is no basis upon which to hold them liable here. Summary judgment on plaintiff's related medical claims should thus be granted.

In the claim that he labels as number two herein, plaintiff alleges that "the defendants" do not provide inmates with bed linen and that he was only provided with a "holely" blanket and a two-inch thick mattress for sleeping purposes. Plaintiff presents no facts that show that either of the named defendants was personally involved in the provision of bedding materials to him nor does he identify any policy or custom in that regard. While the total deprivation of a mattress or any bedding for a significant period of time might result in a constitutional violation, Steele v. St. Martin Parish Sheriff's Department, No. 10-CV-1788, 2011 WL 4747895 at *6 (W.D. La. Sept. 22, 2011), adopted, 2011 WL 4765196 (W.D. La. Oct. 6, 2011), such is simply not the case here. See also Phillips v. East, 81 Fed.Appx. 483, 485 (5th Cir. 2003).

Based upon a review of the grievance forms that were initiated

23

by plaintiff during the three-month period of incarceration at issue, it was not until October 4, 2012, over two months after he arrived at OPP, that he made any formal complaint regarding his bedding. (Rec. doc. 19-5, p.25). Even then, his complaint was that his blanket and mattress had been stolen by another inmate rather than a complaint about the adequacy of the bedding materials themselves. (Id.). In response to that grievance, plaintiff was told that he would be provided with another mattress, (rec. doc. 19-5, p. 26), and the absence of any further complaints regarding his bedding supports the inference that that was accomplished and that the replacement was sufficient. In the absence of any such complaints, prison officials could neither know of nor disregard an excessive risk to plaintiff's health so as to establish deliberate indifference. Ford, 2012 WL 2567063 at *9. And, in any event, the discomfort complained of by plaintiff is de minimis in nature. Steele, 2011 WL 4747895 at *7. Summary judgment on this claim is thus appropriate.

As his claim which is labeled as number three, Ford complains that he was housed on the medical tier of OPP along with other pre-trial detainees and convicted prisoners who suffer from various medical problems. This, plaintiff alleges, resulted in fights involving other inmates on "a few occasion[s]" and caused him to fear for his safety. Ford proposes that inmates be separated

according to the status of their criminal cases and further separated according to the illnesses from which they suffer.

Plaintiff does not allege that either of the specifically named defendants played any part in his housing assignment. On that score, the law is clear that decisions regarding the classification and housing of inmates are entrusted to prison officials in the first instance. See Hernandez v. Velasquez, 522 F.3d 556, 562 (5th Cir. 2008)(quoting Wilkerson v. Stalder, 329 F.3d 431, 436 (5th Cir.), cert. denied sub nom. 540 U.S. 966, 124 S.Ct. 432 (2003) and McCord v. Maggio, 910 F.2d 1248, 1251 (5th Cir. 1990)). In general, a prisoner has no liberty interest in his custodial classification. Id. (citations omitted). Only when a prisoner demonstrates "extraordinary circumstances" may he maintain a due process challenge to a change in his custodial classification, id., and only those conditions which impose ". . . atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life ..." will implicate the protections of the Due Process Clause. Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995). Even a prisoner's placement in extended lockdown is generally not sufficiently atypical or such a significant hardship to state a claim of constitutional dimensions. Hanna v. Maxwell, 415 Fed.Appx. 533, 536-37 (5th Cir. 2011); Fisher v. Wilson, 74 Fed.Appx. 301, 302 (5th Cir. 2003);

25

Bannister v. Deville, 211 F.3d 593, 2000 WL 329244 at *1 (5th Cir.)(table), cert. denied, 464 U.S. 897, 104 S.Ct. 248 (1983).

As observed by the moving defendants, it is not per se unconstitutional to house pre-trial detainees and convicted prisoners together. In Jones v. Diamond, 636 F.2d 1364, 1374 (5th Cir.), cert. dis'd sub nom. 543 U.S. 950, 102 S.Ct. 27 (1981), the Fifth Circuit held that the indiscriminate housing of pre-trial detainees with convicted prisoners is unconstitutional unless such a practice is reasonably related to the institution's interest in maintaining jail security or physical facilities do not permit their separation. "Classification of inmates in Louisiana is a duty of the [jailer] and an inmate has no right to a particular classification under state law." Woods v. Edwards, 51 F.3d 577, 581-82 (5th Cir. 1995)(quotation omitted).

Defendants argue that in furtherance of jail security and due to space constraints at OPP, all inmates requiring medical monitoring are housed together on a special tier designated for that purpose. In light of those recognized, valid concerns, and in the absence of any injury to plaintiff himself, summary judgment on his classification claim should be granted.

Plaintiff's fourth claim is denominated "Clothing".  He contends that "the defendant" does not provide inmates with clothing that is suitable for each season of the year.  Plaintiff

26

also complains that upon admission to OPP, inmates are not provided with an extra face towel, an extra bath towel, extra underwear, extra socks, or an extra jumper.  On a more personal level, plaintiff states that on September 4, 2012, he filed a grievance requesting a change of jumper after wearing the same one for twenty days.  (Rec. doc. 3, p. 61).  The following day, plaintiff was advised that another jumper would be provided to him which he ultimately received on September 9, 2012.  (Rec. doc. 3, p. 62). While plaintiff additionally contends that he filed a separate grievance requesting another pair of underwear, no such grievance is within those that have been provided to the Court by plaintiff or the defendants.

In addressing this claim, the Court first notes that plaintiff fails to identify "the defendant" to whom his allegations are directed.  He sets forth no facts establishing any personal involvement on the part of either of the named defendants and he identifies no policy or custom for official capacity liability purposes.  As this case has not been certified as a class action and plaintiff lacks standing to urge the rights of other prisoners, his claim here is limited to that which he personally experienced.

Plaintiff does not allege that he was not provided with clothing and essential personal items like face and bath towels, only that he was not provided with an extra set of such items free

of charge.  The Court notes that many of these items are available for purchase through the OPP commissary (rec. doc. 23, pp. 35-36), and there is no suggestion that plaintiff lacked the funds to do so.  However, the Constitution does not require that inmates be provided with items such as undergarments free of charge.  <u>Thomas v. Gusman</u>, No. 11-CV-1424, 2012 WL 607970 at *6 (E.D. La. Jan. 27, 2012), <u>adopted</u>, 2012 WL 607698 (E.D. La. Feb. 24, 2012). Plaintiff's grievance regarding his jumper was responded to promptly within one day and was furnished another jumper within a few days thereafter.  As no deliberate indifference has been shown here, summary judgment on this claim is also appropriate.

In his fifth claim herein, denominated as "Deputy", plaintiff alleges "... that the defendants failed to properly train his deputy", thus placing inmates' health and safety in jeopardy. Plaintiff cites an unspecified number of fights and physical altercations between inmates, deputies sleeping or abandoning the tiers to which they have been assigned, and understaffing in general.

Here, again, no personal involvement on the part of the two named defendants has been alleged nor has a policy or custom been identified.  Nevertheless, the Court will analyze plaintiff's claim as one alleging a failure-to-protect.  <u>See Thomas</u>, 2012 WL 607970 at *4 (and cases cited therein).  It is clear that the State owes

a duty to both pre-trial detainees and convicted prisoners to provide for their basic human needs, including protection from harm during their confinement. Id. (citing Hare, 74 F.3d at 650). To prevail on a failure-to-protect claim under §1983, a prisoner must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995). "In order to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer, 511 U.S. at 837, 114 S.Ct. at 1979).

Just like the plaintiff in Thomas, Ford "... does not allege that the purportedly inadequate security has ever placed him in harm's way, that he personally is particularly susceptible to being attacked, or that prison officials have been made aware of and were deliberately indifferent to his need for protection. Instead, he offers nothing more than his vague conclusory allegation that security is inadequate, and it is clear that such allegations do not suffice to state a federal claim." Thomas, 2012 WL 607960 at *5 (and cases cited therein). Accordingly, it will be recommended that summary judgment be granted with respect to this claim.

In his ninth claim, plaintiff complains that the grievance

procedure in place at OPP is inadequate in that "the defendant" fails to provide inmates with copies of it and that the response time is not to his liking.  The short answer here is that inmates have no constitutional right to an adequate and effective grievance procedure or to have their complaints investigated and resolved to their satisfaction.  Propes v. Mays, 169 Fed.Appx. 183, 184-85 (5th Cir. 2006); Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); Tyson v. Tanner, No. 08-4599, 2009 WL 2883056 at *5 (E.D. La. Aug. 25, 2009).  That fact notwithstanding, a review of the numerous grievances that Ford initiated during his three-month stay at OPP belies any credible claim of inadequacy.  (Rec. doc. 3, pp. 32-105; 19-4, pp. 1-33; 19-5, pp. 1-43).  Summary judgment on this claim should thus be granted.

Ford's tenth claim in this case is that "the defendant['s]" legal assistance program is inadequate and fails to provide meaningful access to the courts because there is no comprehensive list of available legal materials, an inadequate supply of paper and pens, especially for indigent inmates, and untrained and generally slow legal advisors.

In addressing this claim which implicates Ford's constitutional right of access to the courts, the Court first notes that up until the time that he pled guilty on August 14, 2012, plaintiff was represented by counsel in his state court criminal

proceedings.  (Rec. doc. 23, p. 26).  That circumstance precludes any finding of a denial of access to the courts through the latter date.  <u>See</u> <u>Richard v. Kinler</u>, No. 08-CV-4251, 2008 WL 4809472 at *2-3 (E.D. La. Oct. 31, 2008)(and cases cited therein). Thereafter, in order for plaintiff to prevail on this claim, he must demonstrate a relevant, actual injury stemming from the defendants' allegedly unconstitutional conduct.  <u>Chriceol v. Phillips</u>, 169 F.3d 313, 317 (5th Cir. 1999)(citing <u>Lewis v. Casey</u>, 518 U.S. 343, 351-54, 116 S.Ct. 2174, 2180-81 (1996)).  "This requires the inmate to allege that his ability to pursue a 'nonfrivolous,' 'arguable' legal claim was hindered." <u>Brewster v. Dretke</u>, 587 F.3d 764, 769 (5th Cir. 2009)(quoting <u>Christopher v. Harbury</u>, 536 U.S. 403, 415, 122 S.Ct. 2179, 2187 (2002)).  "The inmate must describe the underlying claim well enough to show that its 'arguable nature ... is more than hope.'"  (<u>Id</u>.)(quoting <u>Christopher</u>, 536 U.S. at 416, 122 S.Ct. at 2187).

Measured against these standards, plaintiff's claim of denial of access to the courts is not tenable here as he makes no showing that his position as a litigant was prejudiced.  Moreover, a review of the voluminous grievance forms that Ford initiated while he was housed at OPP confirms that he was provided with sufficient assistance by the legal program at OPP, a program that has consistently been found to pass constitutional muster.  <u>Morrison v.</u>

Gusman, No. 10-CV-0217, 2010 WL 724173 at *6 (E.D. La. Feb. 22, 2010).  This claim is without merit.

By way of his claim numbered fourteen, plaintiff complains that "the defendant" does not provide inmates with a receipt for any personal property that may be taken from them upon their admission to OPP.  He also complains that receipts are not provided when funds are deposited into or debited from inmates' prison accounts.  Plaintiff additionally reports that "[i]nmates have had some items missing when they are release[d]."

Plaintiff does not contend that any personal property was actually taken from him at the time that he was admitted to OPP or, if any was, that it was not returned to him when he was released. He sets forth no facts demonstrating any personal involvement on the part of the two specifically named defendants nor does he identify any policy or custom upon which official capacity liability might be predicated.  The Court is also cited to no authority which imposes an affirmative duty on prison officials to issue inmates receipts for their personal property.  And even if some personal items had been taken from Ford and not returned, deprivation of property by a state employee, whether done negligently, Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327, 330, 106 S.Ct. 662, 664 (1986), or intentionally, Hudson v.

<u>Palmer</u>, 468 U.S. 517, 104 S.Ct. 3104 (1984), is not actionable under §1983 when an adequate state law remedy exists.   <u>See also</u> <u>Murphy v. Collins</u>, 26 F.3d 541, 543-44 (5th Cir. 1994); <u>Hines v. Booth</u>, 841 F.2d 623, 624 (5th Cir. 1988).   Louisiana law provides such a remedy.   <u>See</u> LSA-C.C. Art. 2315.   This claim is without merit.

In his fifteenth claim herein, labeled "Release", plaintiff alleges that "the defendant and his employees" are intentionally delaying the release of inmates so that the Sheriff can bill the City and the State for an additional day of housing costs. Plaintiff also contends that his release date was improperly calculated, resulting in him being held in OPP for an additional two to three days.

Here, again, plaintiff sets forth no facts establishing personal involvement on behalf of the two named defendants, an essential elements of a civil rights cause of action.   <u>Thompson</u>, 709 F.2d at 382.   Be that as it may, a review of the grievance forms that have been provided to the Court reflects that on August 23, 2012, Ford made a formal request for his release date.  (Rec. doc. 19-4, p. 16).  A copy of that grievance was sent to the OPP Record Room and on August 28, 2012, plaintiff was informed that his sentence, with credit for time served, would expire at the end of October.  (<u>Id</u>. at pp. 16-17).

On September 5, 2012, Ford completed another grievance form in which he again requested his release date. (Rec. doc. 19-4, p. 20). Like the first grievance, this second one was forwarded to the OPP Record Room and plaintiff was advised that his release date was October 29, 2012. (Id. at pp. 20-21). On September 27, 2012, plaintiff submitted a third grievance, suggesting that his release date was October 27, 2012 rather than October 29, 2012. (Rec. doc. 19-5, p. 11). Once again, this third grievance was forwarded to the OPP Record Room and on October 4, 2012, plaintiff was advised that "[t]he computer calculates your time and it's giving a roll out date of 10/29". (Id. at pp. 11-12). Also on September 27, 2012, plaintiff initiated yet another grievance directed to Corporal Harrell in which he requested his arrest and booking dates. (Rec. doc. 19-5, p. 13). Plaintiff was provided with the requested information on October 4, 2012. (Id. at p. 14). Ford initiated one final grievance related to his release date on October 3, 2012, this one directed to Major Winfield. (Rec. doc. 19-5, p. 23). Again, plaintiff questioned whether the calculation of his release date was correct and asserted that it should properly be October 27, 2012. (Id.). On October 17, 2012, plaintiff was advised that he had "... received all your credit and your roll out date is 10/29/12". (Id. at p. 24).

Attached to the defendants' motion for summary judgment is an

34

affidavit from Major Rochelle Lee, the Director of Records with the Orleans Parish Sheriff's Office.   (Rec. doc. 19-8).   In it, Lee attests to the fact that plaintiff's release date was determined to be October 29, 2012 based upon a computer calculation.   (Id.). Although referred to as a "release date" in both common parlance and in practice, the date noted as such for any given inmate is actually the last day of their sentence.   (Id.).   Lee further attests to the fact that it is the practice of OPP to begin processing inmates for release prior to the completion of the final day of their sentence and to release them prior to the actual expiration of that sentence at midnight.   (Id.).   Plaintiff's release processing was completed and he was released from OPP on October 30, 2012 at 1:08 a.m.   (Id.).

In order to establish a violation of a prisoner's Fourteenth Amendment due process right to be free from continued detention, the plaintiff must show that the defendant acted with deliberate indifference.   West v. Tillman, 496 F.3d 1321, 1327 (11th Cir. 2007).   That requires a showing that the defendant had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than mere negligence.   Id. (quotation and citation omitted).   Human error does not equate with deliberate indifference.   Id.   The Due Process Clause is simply not implicated by a negligent act of a government official causing unintended loss

35

of or injury to life, liberty, or property.  <u>Herrera v. Millsap</u>, 862 F.2d 1157, 1160 (5th Cir. 1989); <u>Simmons v. McElveen</u>, 846 F.2d 337, 339 (5th Cir. 1988).

Based upon the summary judgment evidence that is before the Court, deliberate indifference on the part of the named defendants has not been established here.  Plaintiff's release date was calculated by a computer and he presents no facts establishing that either of the defendants played any part in that determination or were even aware of when his release date was.  Nor has he shown that either of the named defendants had any involvement in his release processing.  In order to successfully plead a cause of action in a civil rights case, a plaintiff must enunciate a set of facts that illustrate the defendant's participation in the alleged wrong.  <u>Jacquez v. Procunier</u>, 801 F.2d 789, 793 (5th Cir. 1986). Moreover, plaintiff's request for damages with respect to this claim runs afoul of the strictures of <u>Heck v. Humphrey</u>, 512 U.S. 477, 114 S.Ct. 2364 (1994).  In <u>Randell v. Johnson</u>, 227 F.3d 300 (5th Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 971, 121 S.Ct. 1601 (2001), the Fifth Circuit held that a former prisoner who is no longer in custody, and thus unable to obtain habeas relief, is still bound by <u>Heck</u> and is unable to maintain a §1983 action in which he claimed that the duration of his confinement was unlawful absent a showing that the continued imprisonment has been declared invalid by an

appropriate tribunal.  See also Garcia v. Quarterman, No. 07-CV-0158, 2007 WL 3037241 at *2-3 (E.D. Tex. Oct. 18, 2007). Accordingly, it will be recommended that summary judgment be granted on this claim as well.

Plaintiff's sixteenth claim, denominated "Store", is that the defendant overcharges inmates for items sold in the OPP commissary and operates a "monopoly".  He also argues that inmates who suffer from diabetes are allowed to buy snacks from the commissary that are high in sugar content.  Plaintiff does not state that he actually purchased anything from the commissary on any occasion and he has no standing to urge this claim on behalf of other prisoners. More importantly, there is no constitutional right that inmates have the ability to purchase items from a prison commissary. Patin, 2012 WL 3109402 at *31.  Nor do inmates have a constitutionally protected liberty interest in purchasing goods from the commissary at the cheapest possible price.  Id.  In Vinson v. Texas Board of Corrections, 901 F.2d 474, 475 (5th Cir. 1990), for example, the Fifth Circuit affirmed the dismissal of a prisoner's suit as frivolous, as well as the imposition of sanctions in the amount of one-hundred fifty dollars, where the prisoner had alleged, inter alia, that the commissary was selling rulers for thirty cents above normal price and typing paper for five cents more than the normal price, referring to the issues

raised as utterly lacking in merit.  In light of these authorities, summary judgment on this claim is in order.

Plaintiff's seventeenth claim in this case is designated "Utensil".  He alleges that "the defendant" does not provide inmates with new eating utensils on a daily basis.  Plaintiff states that inmates are given one spoon upon their admission to the jail but are not told of the consequences if the spoon is lost or misplaced.  Ford speculates that if you lose or accidentally throw your spoon away you will have to ask another inmate for a replacement, who may expect monetary compensation, or purchase a new one from the prison commissary which may prove to be problematic if you are indigent.  Plaintiff also complains of a lack of cleaning materials.

Plaintiff presents no facts establishing any personal involvement on the part of the two specifically named defendants. He also does not allege that he actually lost or misplaced his spoon on any occasion or, if so, that he was unable to obtain a replacement.  Nor does Ford contend that he ever became ill or suffered any adverse effects as a result of using unsanitary food utensils.  As the Court has previously noted, "[a]dmittedly, there is a point beyond which a prison's conditions are so unsatisfactory as to render them unconstitutional".  Hawkins v. Gusman, No. 10-CV-1178, 2011 WL 1527218 at *3 (E.D. La. Apr. 1, 2011), adopted, 2011

38

WL 1527021 (E.D. La. Apr. 20, 2011)(citing <u>Gates v. Cook</u>, 376 F.3d 323, 338 (5th Cir. 2004)(confinement in "'extremely filthy' [cells] with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls" was unconstitutional)).  However, "[t]he mere fact that the prison is not always as pleasant as a prisoner would like does not render the conditions unconstitutional."  <u>Id</u>. (citing <u>Talib v. Gilley</u>, 138 F.3d 211, 215 (5th Cir. 1998); <u>Wilson v. Lynaugh</u>, 878 F.2d 846, 849 & n.5 (5th Cir. 1989)(noting that the Constitution does not protect prisoners from "discomfort and inconvenience" and that prisoners "cannot expect the amenities, conveniences, and services of a good hotel")).  As plaintiff has not identified any "basic human need" that he was denied for an unreasonable period of time nor alleged that he suffered harm as a result of the utensil situation at OPP, his claim is unavailing here.  <u>McBride v. Shackleford</u>, No. 07-CV-0143, 2008 WL 544941 at *1 (N.D. Miss. Feb. 22, 2008)(citing <u>Woods</u>, 51 F.3d at 581).

In his eighteenth enumerated claim, plaintiff contends that "the defendants" fail to provide inmates with information pertaining to telephone usage and deny indigent inmates the opportunity to use the telephone.  Ford additionally complains that inmates' phone calls are monitored without a search warrant.

Here, again, plaintiff fails to set forth any facts pointing

to any personal involvement on the part of the two specifically named defendants.  Ford also fails to allege that he, personally, was unaware of how to use the telephone at OPP, that he was indigent and was denied the opportunity to use the telephone on that basis, or that he was unable to use the phone on any occasion. That aside, jail officials are accorded broad discretion in fashioning prison regulations regarding telephone use.  Hill v. Estelle, 537 F.2d 214, 215 (5th Cir. 1976).  Prisoners have no right to unlimited telephone use and their right to telephone access is subject to rational limitations in the face of legitimate security interests of the penal institution.  Douglas v. Gusman, 567 F.Supp.2d 877, 886 (E.D. La. 2008)(quotations and citations omitted).  In light of inmates' known propensities to make threatening phone calls or to try to further their illegal activities while in jail, OPP disallows prisoners from possessing cell phones and routinely records inmates' phone calls.  See, e.g., Waganfeald v. Gusman, 674 F.3d 475, 484-85 (5th Cir.), cert. denied, ___ U.S. ___, 133 S.Ct 328 (2012).  Those practices are reasonably related to penological interests and easily pass constitutional muster.  Turner, 482 U.S. at 89, 107 S.Ct. at 2261.  This claim is without merit.

Plaintiff's nineteenth claim is designated "Laundry".  He alleges that the laundry service at OPP is inadequate and

unsanitary in that clothing that is sent out to be washed sometimes comes back two to three days later.  Plaintiff also repeats the allegations that he made earlier under the rubric of his fourth claim about the lack of an extra jumper and undergarments.

The law is clear that jail officials must provide inmates with "reasonably adequate" sanitation.  Green v. Ferrell, 801 F.2d 765, 771 (5th Cir. 1986)(citing Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977), modified on other grounds sub nom. 438 U.S. 781, 98 S.Ct. 3057, cert. denied, 438 U.S. 915, 98 S.Ct. 3144 (1978)).  As was touched upon earlier, while there is clearly a point beyond which a prison's conditions are so unsanitary so as to render them unconstitutional, that threshold is a high one indeed.  Gates, 376 F.3d at 338.  In Green, the Fifth Circuit found that a jail need not utilize off-site commercial laundry services or have on-site laundry facilities where inmates had access to laundry detergent for the purpose of hand washing their clothing in the sink.

Plaintiff does not allege that he is totally without clothing during the time that other garments are being laundered at the prison's laundry facilities.  Although Ford states that "the defendant" does not want inmates to wash their own clothes and to hang them on the cell bars and the bed to dry, he does admit that most inmates wash at least their white clothes by hand.  Given that option, the laundry service turnaround time complained of by Ford

41

fails to establish a constitutional violation.  In any event, as plaintiff failed to lodge any grievances which put prison officials on notice of his dissatisfaction with the turnaround time, deliberate indifference on the part of the two named defendants has not been established so as to hold them liable here.  This claim is without merit.

By way of the claim which he labels as number twenty, plaintiff complains that "the defendant" does not allow inmates in isolation to go out on the yard and only allows such inmates out of their cells to shower and, once per month, to go out on the tier for a period of twenty-four hours.  Plaintiff posits that inmates in isolation be afforded one hour of outdoor exercise per day.

This claim falters for a variety of reasons.  Here, again, plaintiff fails to specifically identify the defendant who allegedly curtailed isolation inmates' access to outdoor exercise, fails to set forth any facts showing personal involvement on the two named defendants' part, and fails to identify any policy or custom for official capacity liability purposes.  More importantly, plaintiff does not allege that he, personally, was ever placed in isolation during the three months at issue and he lacks standing to urge this claim on behalf of other inmates.  Patin, 2012 WL 3109402 at *7-8.  Even if plaintiff had been housed in isolation during his incarceration at OPP, as will be discussed more fully infra in

42

connection with his twenty-second claim, the limited outdoor recreational opportunities of which he complains are not sufficiently egregious so as to amount to a constitutional violation.  Summary judgment on this claim is appropriate as well.

In his twenty-first claim, denominated "Disciplinary Procedure", Ford alleges that "the defendant['s]" disciplinary procedures are inadequate in that "the defendant" does not provide inmates with copies of the applicable disciplinary procedures or any other rules or regulations and does not allow inmates to call witnesses.  Once again, plaintiff fails to identify the particular defendant who committed the purported constitutional violation. Nor does he allege that he was ever subjected to disciplinary proceedings during the relevant time period at issue.  The lack of such an allegation is fatal to plaintiff's §1983 claim.  Sweat v. Corrections Corp. of America, No. 08-CV-0917, 2009 WL 774454 at *2-3 (W.D. La. March 24, 2009).

Finally, in the claim that he designates as number twenty-two herein, plaintiff alleges that "the defendant" does not allow inmates housed on the medical tier "to go on the yard daily" for the purpose of exercising.  During the three-month period at issue, plaintiff estimates that he exercised outdoors in the yard on only three occasions.  This, he contends, is contrary to the advices of an unidentified doctor who stressed the importance of taking

prescribed medications, getting proper sleep, and exercising daily.

Plaintiff's claim regarding the lack of adequate outdoor exercise opportunities was raised in his prior lawsuit against the Sheriff and was found to be legally frivolous and to fail to state a claim upon which relief can be granted. Ford, 2012 WL 2567063 at *18-20. For the reasons cited in that well-reasoned prior opinion, the claim is equally unavailing here. First, plaintiff fails to specifically identify "the defendant" who actually caused the alleged constitutional violation. Id. (citing Lawson v. Stevens, 62 F.3d 394, 1995 WL 450100 at *1 (5th Cir. 1995)(and other cases). Second, "[i]nmates have no protected liberty interest in specific recreational opportunities and the '[d]eprivation of exercise is not a per se constitutional violation.'" Ellis v. Crowe, No. 09-CV-3061, 2010 WL 724158 at *13 (E.D. La. Feb. 19, 2010)(Africk, J.)(quoting Lewis v. Smith, 277 F.3d 1373, 2001 WL 1485821 at *1 (5th Cir. 2001)(table)(and other cases). "To succeed on a claim under Section 1983 for lack of exercise, a prisoner must establish 'the existence of any health hazard under the specific circumstances involved.'" Ford, 2012 WL 2567063 at *19 (citation omitted).

Although plaintiff may not have had as much of an opportunity for outdoor exercise as he would have preferred, he does not contend that he was denied the opportunity to exercise indoors. In

44

addition, just as he did in his previous lawsuit, Ford has presented no evidence that the lack of greater outdoor exercise opportunities caused any serious health hazard. <u>Ford</u>, 2012 WL 2567063 at *19.  As was noted in that thorough prior opinion, in the absence of evidence of serious injury, a denial of out-of-cell exercise for seven or even thirteen months has been found to be insufficient to establish a constitutional violation.  <u>Id</u>. (citing <u>Haralson v. Campuzano</u>, 522 F.3d 556, 561 (5th Cir. 2008) and <u>Hernandez v. Velasquez</u>, 522 F.3d 556, 561 (5th Cir. 2008)).  For these reasons, summary judgment on this claim is appropriate as well.

In the relief portion of his complaint, plaintiff pled unspecified pendent state law claims sounding in negligence. (Rec. doc. 3, p. 30).  With the granting of the defendants' motion and the dismissal of plaintiff's federal claims, his state law claims should be dismissed without prejudice.  28 U.S.C. §1367(c)(3); <u>Sibley v. Lemaire</u>, 184 F.3d 481, 490 (5th Cir. 1999), <u>cert</u>. <u>denied</u>, 529 U.S. 1019, 120 S.Ct. 1420 (2000).

## <u>RECOMMENDATION</u>

For the foregoing reasons, it is recommended that defendants' motion for summary judgment be granted and that plaintiff's federal claims be dismissed with prejudice.

It is further recommended that plaintiff's state law claims be

dismissed without prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this _18th_ day of _____July_____, 2013.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE